******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

ECKER, J., with whom ROBINSON, C. J., joins, concurring in the judgment. Although I agree with the disposition of this appeal, I write separately because I do not agree with substantial aspects of the legal analysis employed by the majority opinion to reach that result. More specifically, I disagree with the constitutional point raised in the final paragraph of part I of the majority opinion, and I further disagree with that portion of part II of the majority opinion suggesting that the issuance of the variances to the defendant Paul E. Breunich was in any way constitutionally compelled such that the denial of the application would have amounted to a practical confiscation or inverse condemnation of his property. I instead would affirm the judgment of the trial court dismissing the appeal of the plaintiff, Karl Mayer-Wittmann, executor of the estate of Gerda Mayer-Wittmann, on the ground that the named defendant, the Zoning Board of Appeals of the City of Stamford (zoning board), did not abuse its discretion when it granted the variances on the basis of its finding that the natural event that severely damaged Breunich's sea cottage, combined with the mandatory flood regulations imposed by the city of Stamford and the Federal Emergency Management Agency (FEMA), combined to create an unusual hardship. I therefore concur in the judgment.

I

My disagreement with the majority arises at two different points in its opinion. First, in the final portion of part I of its opinion, the majority refers to constitutional concerns that would arise were the court to hold that the sea cottage automatically lost its legally nonconforming status either by operation of article IV, § 10 (C), of the Zoning Regulations of the city of Stamford (regulations),[1] or because Breunich was required to obtain variances before the zoning board could authorize reconstruction of the sea cottage.[2] Second, and more prominently, part II of the majority opinion holds that "Breunich established the existence of an unusual hardship warranting approval of his application for variances *because the strict enforcement of the regulations would have deprived him of his constitutionally protected right to continue using the sea cottage*, which is an existing, legally nonconforming accessory structure. . . . [W]*ithout variances in some form, Breunich simply would be unable to reconstruct the sea cottage, resulting in an inverse condemnation of his existing, legally nonconforming use.* In other words, it would result in an unusual hardship." (Emphasis added.)

I cannot agree with the majority's constitutional analysis. Indeed, I understand the applicable law, herein-

after referred to as the "casualty doctrine," to say exactly the opposite, namely, that a landowner generally has *no* constitutional right to rebuild a legally nonconforming structure that has been substantially destroyed by fire, flood, or some other comparable force majeure.[3] See generally D. Gross, annot., "Zoning: Right to Repair or Reconstruct Building Operating as Nonconforming Use, After Damage or Destruction by Fire or Other Casualty," 57 A.L.R.3d 419 (1974 and Supp. 2018) (collecting extensive case law from across the country, including Connecticut); 4 E. Ziegler, Rathkopf's The Law of Zoning and Planning (2011) § 74:11, pp. 74-38 through 74-42 (citing cases). The casualty doctrine is no stranger to Connecticut; one of the early cases articulating the doctrine, still cited in modern cases and treatises on the subject, was decided by this very court. See *State* v. *Hillman*, 110 Conn. 92, 107, 147 A. 294 (1929) (rejecting landowner's constitutional attack on zoning regulation that prohibited restoration of legally nonconforming building if more than 50 percent of its assessed value was destroyed by fire). Yet another Connecticut case lends indirect but significant support to the same point by affirming a zoning board's decision denying the landowners' petition for permission to rebuild a legally nonconforming structure that had been destroyed by fire. See *Piccolo* v. *West Haven*, 120 Conn. 449, 455, 181 A. 615 (1935).

This court's decision in *Hillman* provides an early but nonetheless representative illustration of the casualty doctrine at work. Indeed, it continues to be cited as a seminal case on the subject.[4] The defendant, Isaac Hillman, was a corporate officer of an industrial company that operated within the city of Bridgeport prior to the enactment of zoning regulations in 1925, and then continued to operate as a preexisting nonconforming use after the zoning regulations were adopted. *State* v. *Hillman*, supra, 110 Conn. 94–98 (preliminary statement of facts and procedural history). The next year, a fire destroyed numerous company buildings necessary for the operation of the business, and the company sought to rebuild. The company's application to reconstruct the damaged buildings was denied by the city, however, pursuant to a regulation prohibiting reconstruction of a nonconforming building that is damaged by fire in an amount exceeding 50 percent of the building's value. Id., 98–99 (preliminary statement of facts and procedural history). Hillman was convicted of violating the city's zoning laws after the company failed to relocate and instead continued to operate from its original location using temporarily repaired buildings. Id., 99 (preliminary statement of facts and procedural history). This court rejected the defendant's claim that the operative zoning regulations were unconstitutional "in that they purport to deprive this company and this defendant of his property without just compensation." Id., 105. The court's constitutional analysis concludes

that "we are unable to hold that when over [50 percent] of [the company's] buildings are destroyed it was not a fair exercise of the police power to refuse to permit the company to restore the burned building and continue the nuisance in [the newly zoned district]." Id., 107.[5]

As previously noted, the case law from across the country is consistent with our decision in *Hillman* as it relates to the casualty doctrine. The Rathkopf treatise characterizes as "customary" zoning regulations terminating a legal nonconformity in the event of a casualty causing substantial destruction of the nonconforming structure, and describes the underlying logic of such regulations as follows: "In conformity with the philosophy that the spirit of zoning is to restrict, rather than increase, nonconforming uses and to eliminate such uses as speedily as possible, and in order to discourage the reestablishment of nonconforming uses, the investment value of which has been lost to the owner through accident and through no action on the part of the municipality, *it is customary to provide in zoning ordinances a prohibition against the replacement of a nonconforming structure or one employed in a nonconforming use in excess of a specified percentage, this percentage being fixed as equivalent to substantial destruction.*" (Emphasis added.) 4 E. Ziegler, supra, § 74:11, p. 74-38.[6]

The Rathkopf treatise quotes at length from a case decided by the Colorado Supreme Court explaining why such regulations pass constitutional muster: " 'If a property owner has invested money in improvements in order to put his property to a particular use, which is lawful at that time, and if that use is subsequently outlawed by a zoning ordinance, he loses not only the potential use but also the value of his investment. To impose this additional loss upon him is unreasonable, and therefore he is entitled to continue to use his property as he did before. On the other hand, if the improvements are destroyed or abandoned, he has lost the value of his investment independently of the ordinance and there is no reason why his relationship to the zoning ordinance should be any different [than] that of his neighbor whose property was unimproved. . . . If the owner of a nonconforming use suffers the destruction of his improvements, he becomes the owner of unimproved property. The unimproved property may be restricted as to use without a denial of due process. The effect of the fire which substantially destroyed the service station was to sever the improvements from the real estate. Had the [plaintiff] been denied a building permit for a filling station on unimproved property, no one could contend that it was unreasonable or that it was a denial of due process.' " Id., pp. 74-39 through 74-40, quoting *Service Oil Co.* v. *Rhodus*, 179 Colo. 335, 347–48, 500 P.2d 807 (1972).

The majority contends that the casualty doctrine would not permit the zoning board to deny a variance in the present case because, in the absence of a variance, Breunich would "lose the *entire* value of the sea cottage"; (emphasis in original) footnote 13 of the majority opinion; whereas the cases finding no constitutional violation involve situations in which the landowner remains able to make some other use of the property despite the loss of a building to fire or other casualty. As I pointed out in my discussion of *Hillman*; see footnote 5 of this concurring opinion; the majority's point conflates two different calculations, the loss of value in *the nonconforming building* and the loss of value in *the property*. The former calculation is used in many zoning regulations, including Stamford's, to determine whether the landowner has the right, without a variance, to rebuild a nonconforming building after it has been damaged; the latter calculation is used to decide whether just compensation must be paid by a municipality that has prohibited restoration. The fact that the landowner may lose the entire value of the damaged structure is not the critical issue under either calculation. Indeed, the more severe the loss caused by the casualty to the building itself, the *stronger* the case becomes for application of the casualty doctrine because its applicability depends on the loss being caused by a force *other than the zoning regulation.* See, e.g., *Krul* v. *Board of Adjustment*, 122 N.J. Super. 18, 24–25, 298 A.2d 308 (Law. Div. 1972) ("The right to restore or repair thus is limited by the caveat that the structure be only partially destroyed. . . . Thus where the destruction of a building is only partial, restoration or repair is permitted to protect and maintain that investment in recognition of the right of the property owner to continued protection of his use free of the restriction imposed subsequent to the vesting of that use. If, however, a structure is destroyed totally rather than partially, the property owner in effect holds only vacant land and should be controlled by the existing zoning restrictions in the same manner as other owners of undeveloped land. Under such circumstances the dilemma of the property owner—the loss of his investment—is one created by the unfortunate casualty and not by virtue of the power of government." [Citations omitted.]), aff'd, 126 N.J. Super. 150, 313 A.2d 220 (App. Div. 1973).[7]

## II

That said, I nonetheless agree with the outcome reached by the majority because I do not believe that our precedent, properly construed, requires a zoning board to deny a variance in all cases where the landowner fails to make the showing necessary to establish a constitutional violation, i.e, that enforcement of the zoning requirement has deprived the property of all reasonable use and value, thereby practically confiscat-

ing the property. That strict standard applies to claims based on *economic* hardship, but there are situations where a landowner may establish the necessary hardship without satisfying the constitutional standard, and this is such a case. The sea cottage, a legally nonconforming accessory structure, was severely damaged by a catastrophic natural event; the demands of public health and safety had caused both the local and federal governments to enact flood regulations of such importance that compliance was required, despite the special status accorded to nonconforming structures; "as before" restoration was flatly impossible due to the particular location of the property and related soil conditions; and Breunich, the landowner, had made good faith efforts to reduce the nonconformities to the maximum extent possible under the circumstances. In my view, the zoning board did not act unlawfully when it determined that this confluence of factors combined to subject the landowner, through no fault of his own, to an unusual hardship warranting issuance of the requested variances.

I observe at the outset that the standard of review is correctly summarized by the majority opinion, and must not be overlooked in our consideration of the merits. See *Bloom* v. *Zoning Board of Appeals*, 233 Conn. 198, 205–206, 658 A.2d 559 (1995) ("The standard of review on appeal from a zoning board's decision to grant or deny a variance is well established. We must determine whether the trial court correctly concluded that the board's act was not arbitrary, illegal or an abuse of discretion. . . . Courts are not to substitute their judgment for that of the board . . . and decisions of local boards will not be disturbed so long as honest judgment has been reasonably and fairly exercised after a full hearing. . . . Upon appeal, the trial court reviews the record before the board to determine whether it has acted fairly or with proper motives or upon valid reasons. . . . We, in turn, review the action of the trial court. . . . The burden of proof to demonstrate that the board acted improperly is upon the plaintiffs." [Citations omitted; internal quotation marks omitted.]); see also *Caruso* v. *Zoning Board of Appeals*, 320 Conn. 315, 321, 130 A.3d 241 (2016) ("[a] zoning board of appeals is endowed with a liberal discretion, and its action is subject to review by the courts only to determine whether it was unreasonable, arbitrary or illegal" [internal quotation marks omitted]).[8]

The path to affirmance, in my view, does not require us to ascend to constitutional heights. As the majority correctly points out in quoting *E & F Associates, LLC* v. *Zoning Board of Appeals*, 320 Conn. 9, 15, 127 A.3d 986 (2015), a variance may be granted upon a showing by the landowner that, " 'because of some peculiar characteristic of [the] property, the strict application of the zoning regulation produces an unusual hardship, as opposed to the general impact which the regulation has

on other properties in the zone. . . . Accordingly, we have [concluded that a zoning board of appeals may] grant a variance only when two basic requirements are satisfied: (1) the variance must be shown not to affect substantially the comprehensive zoning plan, and (2) adherence to the strict letter of the zoning ordinance must be shown to cause unusual hardship unnecessary to the carrying out of the general purpose of the zoning plan. . . . Proof of exceptional difficulty or unusual hardship is absolutely necessary as a condition precedent to the granting of a zoning variance.' " This legal standard is prescribed by statute; see General Statutes § 8-6 (a) (3);[9] and we must be careful not to change its meaning by judicial gloss.

Under the circumstances of this case, I do not agree with the majority that the statutory hardship standard is effectively "one and the same" as the legal standard establishing a constitutional violation under the takings clause. I certainly understand how the majority arrived at this conclusion, because our cases, especially recently, paint with the same broad brush in describing the hardship doctrine.[10] Unfortunately, some of these cases have overlooked an important doctrinal qualification when they observe that the zoning hardship standard is "the same" as the constitutional takings standard: the (very high) standard applied to adjudicate constitutional claims properly is used to decide variance applications *only when the landowner relies on a claim of economic or financial hardship to justify the variance.*

This critical doctrinal limitation can be discerned by a close reading of most of our zoning cases invoking the heightened standard, because those cases, which usually involve commercial landowners, indicate that the standard applies when the owner's hardship is based on the economic or financial impact of the zoning restriction at issue.[11] The qualification was more clearly evident in some of our earlier cases.[12] I fear that if we are not careful, the qualification is at risk of being forgotten altogether.

The distinction between the constitutional standard and the zoning law standard has been noted by various courts and commentators. See *Belvoir Farms Homeowners Assn., Inc.* v. *North*, 355 Md. 259, 282, 734 A.2d 227 (1999) ("We reject the proposition that the unnecessary or unwarranted hardship standard is equal to an unconstitutional taking standard. If this were true, it would be a superfluous standard because the constitutional standard exists independent of variance standards."); *First North Corp.* v. *Board of Zoning Appeals*, 8 N.E.3d 971, 984 (Ohio 2014) ("[T]he unnecessary hardship standard for granting use variances is not the same as the constitutional taking standard. The 'hardship' standard necessarily admits that there is *some* use for land, but that use works an unnecessary hardship on the

landowner. The taking standard . . . is one applying to 'a regulation that permanently requires a property owner to sacrifice all economically beneficial uses of his or her land.' . . . The difference between the two standards explains why a variance from a zoning ordinance can be granted under conditions in which the application of that particular zoning ordinance would not result in an unconstitutional taking of property." [Citation omitted; emphasis in original.]); *State* v. *Board of Adjustment*, 244 Wis. 2d 613, 642, 628 N.W.2d 376 (2001) ("[t]he unnecessary hardship standard 'is *neither* the same nor as demanding as a takings analysis' " [emphasis in original]); 8 E. McQuillin, Municipal Corporations (3d Ed. Rev. 1991) § 25.167, p. 761 ("[a] condition of difficulty or hardship is not deemed equivalent to a taking of property, in the constitutional sense").[13]

Once the limitation is acknowledged, the legal analysis applicable to the present case becomes straightforward. As previously mentioned, the question is whether the plaintiff has carried his burden of proving that the zoning board abused its discretion when it found that (1) the variances do not substantially affect the comprehensive zoning plan, and (2) adherence to the strict letter of the relevant zoning ordinances causes Breunich to suffer an unusual hardship unnecessary to carrying out the general purpose of the zoning plan. See *E & F Associates*, *LLC* v. *Zoning Board of Appeals*, supra, 320 Conn. 15.

The variance application at issue in this case did not rely at all on a claim of financial deprivation. The basis for the requested variances was not that Breunich's property had lost value or his income would be diminished unless he was allowed to rebuild the sea cottage. His claim, rather, was predicated on the unusual nature of the hardship suffered as a result of the confluence of four factors: (1) the sea cottage is a century old nonconforming structure that will be gone forever if a variance is not granted;[14] (2) the sea cottage is located within the VE and AE Flood Zones under FEMA standards, which are incorporated into the zoning regulations; (3) "it would be impossible for [Breunich] to meet the more stringent flood zone restrictions without further increasing the height of the sea cottage"; and (4) although the zoning regulations had been amended to dispense with the need for variances for main houses, the sea cottage is an accessory structure for which a variance is required. Under these unusual factual circumstances, moreover, the zoning board concluded that the requested variances did not undermine the comprehensive zoning plan but, to the contrary, brought "the sea cottage into compliance with the current FEMA and city of Stamford flood regulations."

I would hold that the zoning board was entitled to determine, as it did, that Breunich satisfied the applicable legal standard required to establish an unusual hard-

ship. The sea cottage was severely damaged by a hurricane. It could not be rebuilt exactly as before due to FEMA and city of Stamford flood regulations. These regulations not only relate directly to public health and safety,[15] but, as the majority emphasizes, the failure of a municipality to promulgate and enforce such regulations could render properties throughout the entire municipality ineligible for protection under the National Flood Insurance Program, a federal program making flood insurance available to those who would otherwise be unable to procure it.

This confluence of factors—a catastrophic natural event causing severe damage, property conditions and legal imperatives making "as before" restoration flatly impossible, and good faith efforts by the landowner to reduce the nonconformities to the maximum extent possible under the circumstances—are sufficient, in my view, to warrant the zoning board's finding that Breunich had established the existence of an unusual hardship, and I therefore would affirm the judgment of the trial court dismissing the appeal. I note that two other trial courts recently have reached similar conclusions in similar cases involving the reconstruction of storm damaged, nonconforming beachfront homes. See *Turek* v. *Zoning Board of Appeals*, Superior Court, judicial district of Hartford, Docket No. LND-CV-15-6063404-S (April 4, 2018) (66 Conn. L. Rptr. 363, 361); *Kwesell* v. *Zoning Board of Appeals*, Superior Court, judicial district of New Haven, Docket No. NNH-CV-15-6056545–S (May 25, 2017) (64 Conn. L. Rptr. 549, 552–54).

Little needs to be said in response to the plaintiff's argument that the zoning board erroneously concluded that the hardship suffered by Breunich was not different in kind from that generally affecting properties in the same zone. See, e.g., *Garibaldi* v. *Zoning Board of Appeals*, 163 Conn. 235, 238, 303 A.2d 743 (1972) ("[i]t is clear that for a hardship to justify the granting of a variance, the hardship must be different in kind from that affecting generally properties in the same zoning district") There is no reason to partake in the majority opinion's willingness to assume the truth in the plaintiff's contention on this point. The plaintiff misapprehends the issue by arguing that there are many other properties in the flood zone required to comply with the applicable flood regulations, there were many other buildings destroyed by Hurricane Sandy, and nothing makes Breunich's case special. The argument misses the fact that Breunich's contention was that his hardship consisted of the unusual confluence of factors and features making his situation different, namely, the hurricane's destruction of a nonconforming accessory structure located in a highly restrictive flood zone subject to the mandatory flood regulations. The plaintiff, for his part, offers nothing but speculative hypotheses to suggest that any significant number of other landown-

ers were similarly affected. On the other hand, the transcript of the zoning board's meeting on Breunich's application reflects both that its members were fully aware of the legal standard requiring an unusual impact on the applicant, and that the board, upon consideration, found that this requirement had been met.[16] See *Francini* v. *Zoning Board of Appeals*, 228 Conn. 785, 791, 639 A.2d 519 (1994) (noting that zoning board members "are entitled to take into consideration whatever knowledge they acquire by personal observation" [internal quotation marks omitted]).

For these reasons, I agree with the majority's conclusion that "the trial court correctly determined that the zoning board properly granted Breunich's application for variances from the regulations and, therefore, properly dismissed the plaintiff's appeal." Accordingly, I concur in the judgment.

[1] Article IV, § 10 (C), of the Stamford Zoning Regulations provides in relevant part that "[a]ny non-conforming building . . . which has been or may be damaged by . . . flood . . . [or] act of God . . . may be reconstructed and used as before, if reconstruction is started with[in] twelve . . . months of such calamity . . . ."

[2] Invoking the canon of constitutional avoidance in statutory construction, the majority rejects the plaintiff's absolutist construction of the applicable regulations on the ground that "a regulation that entirely deprived a building of its legally nonconforming status might be confiscatory as applied and, as such, of questionable constitutionality."

[3] It is undisputed in the present case that the sea cottage sustained damage exceeding 50 percent of its value, which triggers application of the relevant flood zone elevation requirements to restoration of the structure notwithstanding its legally nonconforming status. The majority also correctly notes that article IV, § 10 (B), of the Stamford Zoning Regulations states in relevant part: "The total structural repairs and alterations that may be made in a structure which is non-conforming in use only shall not exceed [50] percent . . . of its replacement value at the time of the application for the first structural change, unless changed to a conforming use. . . ."

[4] See, e.g., 6 N. Williams & J. Taylor, American Land Planning Law (Rev. Ed. 2019) § 122:2 (describing *Hillman* as "the first zoning case in Connecticut" and noting that "the opinion specifically approved a prohibition against rebuilding a nonconforming establishment" substantially destroyed by fire).

[5] The majority suggests that the casualty doctrine is not operative in *Hillman* and contends that the case instead supports the view that a municipality may prohibit the restoration of a preexisting nonconforming structure only if the landowner is able to replace the structure with a conforming building or buildings of comparable value. I read *Hillman* very differently, as do the treatises cited in part I of this concurring opinion. First and foremost, *Hillman* is a case about loss causation, and it remains an important precedent in that context because it is among the first judicial opinions in the country to articulate the rule that the government acts within constitutional limits when it refuses to permit the restoration of a nonconforming building substantially destroyed by fire. See W. Horton & B. Levesque, "The Wheeler Court," 24 Quinnipiac L. Rev. 301, 329 (2006) (stating that "Connecticut was leading the country" when *Hillman* "sustained a [zoning] regulation prohibiting the rebuilding of a nonconforming factory after a fire destroyed over half the value of the buildings"). Second, in *Hillman*, the constitutional analysis did not turn on the landowner's ability vel non to replace or rebuild the destroyed *buildings*. If the loss to the nonconforming *building* is substantial enough to trigger application of the regulation prohibiting reconstruction, then the constitutional analysis examines the loss in value to the *property* to determine whether a taking has occurred. This point explains why the court in *Hillman* observed that "[t]here is nothing in the [trial court's] finding showing *the extent of the diminution in value of the property or the business*; it may be that these were small in extent." (Emphasis added.) *State* v. *Hillman*, supra, 110 Conn. 107. Applying this observation to the present case, it is clear that Breunich's *property* retains most of its value even without the sea cottage. *Hillman* thus demonstrates

that Breunich would have no plausible constitutional claim if the municipal defendants had denied his application.

[6] There are cases to the contrary, but the Rathkopf treatise explains that the exceptions typically involve jurisdictions in which "the zoning enabling act specifies the extent to which municipalities may restrict the right of a nonconforming owner to repair or restore structures which have been accidentally destroyed. Where such a statutory provision protects the right of a nonconforming owner to repair a structure which has been partially destroyed, the provision has been construed to require termination of the nonconforming use only if the structure in which it has been operated is totally destroyed. Where this type of statutory provision exists, the issue in a case involving destruction of a structure housing a nonconforming use is whether the extent of the destruction found is partial or is so extensive as to amount to total destruction." (Footnotes omitted.) 4 E. Ziegler, supra, § 74:11, p. 74-40. The relevant Connecticut statute contains no such provision. See General Statutes § 8-2.

[7] In a similar vein, the majority opinion states that the present case is distinguishable from *Hillman*, *Piccolo*, and the other casualty doctrine cases because, in contrast to those cases, the landowner here had no options: "[T]here is no evidence in the present case that Breunich would be able to construct a conforming structure of some type on the property if the variances were denied, and he would therefore lose the *entire* value of the sea cottage." (Emphasis in original.) Footnote 13 of the majority opinion. I see two interconnected problems with this contention. First, the idea underlying the casualty doctrine is not that the constitution allows local governments to adopt regulations prohibiting restoration of the nonconforming structure only if the owner is able to recover its loss by building a conforming structure. Instead, as I discussed in the text accompanying this footnote, the underlying idea is that, when the damage caused by the casualty is sufficiently severe, the government does not cause the loss and, therefore, need not permit restoration at all, especially in light of the background principle that nonconformities should be reduced or eliminated over time. See *Salerni* v. *Scheuy*, 140 Conn. 566, 570, 102 A.2d 528 (1954) ("[i]t is a general principle in zoning that nonconforming uses should be abolished or reduced to conformity as quickly as the fair interest of the parties will permit").

Second, even if I were to assume, as the majority does, that the refusal to permit reconstruction of the nonconforming sea cottage in this particular case resulted in Breunich being unable to replace it by building a conforming structure elsewhere on the property—meaning that he has lost "the *entire* value of the sea cottage"—there would still be no viable claim of a *constitutional* violation on this record. (Emphasis in original.) Footnote 13 of the majority opinion. As I noted previously, the takings analysis in this context looks to the diminished value to the entire property, not to the loss in value to the structure (or use) that cannot be restored. This approach is consistent with the treatment of takings more generally, where the constitutional analysis turns on the impact of the regulation on the *total* value of the property, not only the component of the property "confiscated" by the regulation. See *Murr* v. *Wisconsin*,     U.S.    , 137 S. Ct. 1933, 1943–44, 198 L. Ed. 2d 497 (2017) (holding that existence of regulatory taking is determined by comparing value that has been taken from property with value that remains in property viewed in its entirety). I have found nothing in the case law to support the majority's suggestion that the *constitutional* analysis is based on the loss of the destroyed building itself without reference to the value of the entire property.

[8] This situation should not be confused with that in which the hardship claim is made on the basis of economic hardship and the underlying facts indisputably establish that the property retains some economically viable use, in which case the standard of review is plenary. *E & F Associates, LLC* v. *Zoning Board of Appeals*, 320 Conn. 9, 14–15, 127 A.3d 986 (2015) ("[T]he question of whether the board had authority to grant a variance pursuant to [General Statutes] § 8-6 (a) when the property would not lack economic value even if the variance were denied is a question of law. Accordingly, our review is plenary.").

[9] Section 8-6 (a) provides in relevant part: "The zoning board of appeals shall have the following powers and duties . . . (3) to determine and vary the application of the zoning bylaws, ordinances or regulations in harmony with their general purpose and intent and with due consideration for conserving the public health, safety, convenience, welfare and property values solely with respect to a parcel of land where, owing to conditions especially affecting such parcel but not affecting generally the district in which it is

situated, a literal enforcement of such bylaws, ordinances or regulations would result in exceptional difficulty or unusual hardship so that substantial justice will be done and the public safety and welfare secured, provided that the zoning regulations may specify the extent to which uses shall not be permitted by variance in districts in which such uses are not otherwise allowed. . . ."

[10] See, e.g., *Barton* v. *Norwalk*, 326 Conn. 139, 148 n.6, 161 A.3d 1264 (2017) ("[t]he unusual hardship test in zoning variance cases and the substantial destruction test in inverse condemnation cases require a showing that the property cannot be utilized for any reasonable purpose"); *Caruso* v. *Zoning Board of Appeals*, supra, 320 Conn. 322–23 ("Unusual hardship may be shown by demonstrating that the zoning regulation has deprived the property of all reasonable use and value, thereby practically confiscating the property. This contention 'sits at the intersection of two related, yet distinct, areas of law: land use regulation and constitutional takings jurisprudence.' . . . In Connecticut, a taking occurs 'when a landowner is prevented from making any beneficial use of its land—as if the government had, in fact, confiscated it.' . . . Accordingly, a zoning regulation 'permanently restricting the enjoyment of property to such an extent that it cannot be utilized for any reasonable purpose goes beyond valid regulation and constitutes a taking without due process.' . . . The same analysis is used in the variance context because, when the regulation 'practically destroys or greatly decreases [the property's] value for any permitted use to which it can reasonably be put' . . . the loss of value alone may rise to the level of a hardship." [Citations omitted.]).

[11] See, e.g., *E & F Associates, LLC* v. *Zoning Board of Appeals*, supra, 320 Conn. 16 ("considerations of financial disadvantage—or, rather, the denial of a financial advantage—do not constitute hardship, unless the zoning restriction greatly decreases or practically destroys [the property's] value for any of the uses to which it could reasonably be put" [internal quotation marks omitted]); *Rural Water Co.* v. *Zoning Board of Appeals*, 287 Conn. 282, 295, 947 A.2d 944 (2008) (same); *Vine* v. *Zoning Board of Appeals*, 281 Conn. 553, 561, 916 A.2d 5 (2007) ("Disadvantage in property value or income, or both, to a single owner of property, resulting from application of zoning restrictions, does not, ordinarily, warrant relaxation in his favor on the ground of . . . unnecessary hardship. . . . Financial considerations are relevant only in those exceptional situations where a board could reasonably find that the application of the regulations to the property greatly decreases or practically destroys its value for any of the uses to which it could reasonably be put and where the regulations, as applied, bear so little relationship to the purposes of zoning that, as to particular premises, the regulations have a confiscatory or arbitrary effect." [Internal quotation marks omitted.]); *Grillo* v. *Zoning Board of Appeals*, 206 Conn. 362, 369, 537 A.2d 1030 (1988) (same).

[12] A good example is the following statement of the hardship doctrine authored by Chief Justice Maltbie in *Devaney* v. *Board of Zoning Appeals*, 132 Conn. 537, 542–43, 45 A.2d 828 (1946): "Disadvantage in property value or income, or both, to a single owner of property, resulting from application of zoning restrictions, does not, ordinarily, warrant relaxation in his favor on the ground of practical difficulty or unnecessary hardship. Financial considerations alone . . . cannot govern the action of the [zoning] board. . . . Otherwise, there would be no occasion for any zoning law. . . . There are, however, situations where the application of zoning to a particular property greatly decreases or practically destroys its value for any permitted use and the application of the ordinance bears so little relationship to the purposes of zoning that, as to that property, the regulation is in effect confiscatory or arbitrary. . . . Provisions authorizing variation in the application of the ordinance are designed to permit changes which will prevent such results. . . . *Where the only basis of the claim is economic loss from the application of the ordinance*, there rarely would be justification for a variation unless this test is met. *Where other considerations enter into the situation, the question necessarily must be left to the sound discretion of the board, acting within the limitations which we have pointed out, and always with regard to serving the general purposes to accomplish which a zoning ordinance is adopted and to the necessity that all property owners within a zone be treated fairly and equally.*" (Citations omitted; emphasis added; internal quotation marks omitted.)

[13] Although, to the best of my knowledge, the distinction has not clearly been made in any holding of this court, Justice Shea articulated the point with precision in a dissenting opinion: "Such a finding was not essential in

order to satisfy the requirement of 'unusual hardship' for a variance, because a zoning board of appeals is not restricted to providing relief only in situations where enforcement of the regulations would create a hardship sufficient to constitute an unconstitutional taking." *Adolphson* v. *Zoning Board of Appeals*, 205 Conn. 703, 720, 535 A.2d 799 (1988) (*Shea, J.*, dissenting).

[14] Breunich's interest in preventing the complete loss of the nonconforming sea cottage is significant, not because it is entitled to constitutional protection under these circumstances, but because it represents something significantly different than a desire to expand a nonconformity or modernize a structure merely to satisfy the personal preferences of the owner. In combination with the other three factors identified here, this consideration distinguishes the present case from situations in which courts have concluded that a hardship has not been established. See *Verrillo* v. *Zoning Board of Appeals*, 155 Conn. App. 657, 691, 111 A.3d 473 (2015) ("The case law is replete with instances in which an applicant predicated its claim of hardship on a desire to expand an existing nonconforming structure for what our appellate courts have characterized as personal considerations, such as the desire to obtain more space or to modernize an antiquated building. It long has been held that 'disappointment in the use of property can hardly constitute practical difficulty or unnecessary hardship within the meaning of a zoning law or regulation.' ").

[15] The trial court recognized this point: "[T]he increased nonconformity does not have the singular purpose of enhancing [Breunich's] personal use of the sea cottage, but instead has the purpose of bringing the sea cottage into compliance with the current FEMA and city of Stamford flood regulations. The only way for [Breunich] to comply with both of these regulations is to increase the height of the structure by elevating the lowest horizontal point of the home an additional eight feet. . . . The record shows that the usable space of the sea cottage is not increasing, but the existing structure is simply moving upward and three feet north to meet flood requirements. . . . In addition, the livable space within the sea cottage is not changed as a result of the variance." (Citations omitted.)

[16] At that meeting, a member of the zoning board observed that Breunich's situation was "differen[t]" because it involved an accessory building rather than a "main house," which was subject to different regulations. While they expressed some uncertainty, the members of the zoning board opined that there are "a few," but "not many," such structures in Stamford.

───────────────────────